**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**FOREST GUARDIANS**,
**SANTA FE FOREST WATCH**,

Plaintiffs,

vs. No. **CIV 04-0011 MCA/RHS**

**UNITED STATES FOREST SERVICE**, and
**UNITED STATES FISH AND WILDLIFE SERVICE**,

Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on ***Plaintiffs' Motion for Preliminary Injunction*** [Doc. No. 10] filed on January 14, 2004, and the parties' ***Stipulation*** [Doc. No. 28] filed on February 2, 2004. The Court held a hearing and orally ruled on Plaintiff's motion in Albuquerque, New Mexico, on January 30, 2004, in the presence of the parties and their counsel. The parties have stipulated that the hearing on Plaintiff's motion may be consolidated with a final hearing on the merits of the case pursuant to Fed. R. Civ. P. 65(a)(2). [Doc. No. 28.] Having considered the Administrative Record [Doc. No. 20], the written submissions and oral arguments of counsel, the applicable law, and being fully advised in the premises, the Court grants Plaintiffs' motion in part by enjoining all further ground-disturbing work in "Unit 6" of the "Lakes and BMG Wildfire Timber Salvage Sale" for the reasons set forth below. The Court denies Plaintiffs' motion in part with respect to the other units of this timber sale.

As a preliminary matter, it is emphasized that it is not the Court's role to set policy for the United States Forest Service or the United States Fish and Wildlife Service with respect to the broad issue of whether salvage timber sales may ever be conducted in "protected activity centers" occupied by Mexican spotted owls or in the "essential zone" of the Jemez Mountains salamander. Nor is it the Court's role to endorse one scientific view of the environmental consequences of salvage logging over another. Rather, the ruling which is made is specific only to the facts of this case as presented in the Administrative Record.

## I. FINDINGS OF FACT AND PROCEDURAL BACKGROUND

### A. Mexican Spotted Owl

1. The United States Fish and Wildlife Service (USFWS) listed the Mexican spotted owl as a threatened species under the Endangered Species Act (ESA) on March 16, 1993. See Final Rule to List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248 (Mar. 16, 1993).

2. "Past, current, and future timber-harvest practices in the Southwestern Region (Region 3) of the USDA Forest Service (USFS) were cited as the primary factors leading to listing the Mexican spotted owl as a threatened species." [FWS-AR 34, at 2.][1]

---

[1]Defendants have designated two administrative records in this case [Doc. No. 20], and the Court has reviewed both of them. In this *Memorandum Opinion and Order*, the Administrative Record designated by the United States Forest Service is cited as "FS-AR," and the Administrative Record designated by the United States Fish and Wildlife Service is cited as "FWS-AR." Collectively, the two administrative records are referenced as "the Administrative Record."

3. In December 1995, the USFWS issued a Recovery Plan for the Mexican spotted owl (Recovery Plan) in accordance with its duties under the ESA. The duration of the Recovery Plan is ten years, assuming that delisting criteria are met. [FWS-AR 34, at 12.]

4. The goal of the Recovery Plan "is to protect conditions and structures used by spotted owls where they exist and to set other stands on a trajectory to grow into replacement nest habitat or to provide conditions for foraging and dispersal." [FWS-AR 34, at 82.]

5. In order to achieve this goal, the Recovery Plan establishes three levels of habitat management for the Mexican Spotted Owl: "protected areas, restricted areas, and other forest and woodland types . . . . Protected areas receive the highest level of protection under this plan, other forest and woodland types the lowest. Guidelines proposed in this Recovery Plan take precedence over other agency management guidelines in protected areas." [FWS-AR 34, at 84.]

6. The "protected areas" afforded the highest degree of protection under the Recovery Plan include "protected activity centers" or "PACs." The Recovery Plan provides the following guidelines pertaining to the designation and management of "protected activity centers" or "PACs" around the owls' known nesting and roosting sites:

> 1. Establish PACs at all Mexican spotted owl sites known from 1989 through the life of the Recovery Plan, including new sites located during surveys. . . . Identify the activity center within each PAC. "Activity center" is defined as the nest site, a roost grove commonly used during the breeding season in absence of a verified nest site, or the best roosting/nesting habitat if both nesting and roosting information are lacking. Site identification should be based on the best judgment of a biologist familiar with the area. Delineate an area no less than 243 ha (600 ac) around this activity center using boundaries of known habitat polygons and/or topographic boundaries, such as

ridgelines, as appropriate . . . . The boundaries should enclose the best possible owl habitat, configured into as compact a unit as possible, with the nest or activity center located near the center. This should include as much roost/nest habitat as is reasonable, supplemented by foraging habitat where appropriate. . . . All PACs should be retained for the life of this Recovery Plan, even if spotted owls are not located there in subsequent years. A potential exception to this rule is described in #8 below.

2. No harvest of trees >22.4cm (9 in) dbh is allowed in PACs. . . .

. . . .

8. If a stand-replacing fire occurs within a PAC, timber salvage plans must be evaluated on a case-specific basis. In all cases, the PAC and a buffer extending 400m from the PAC must be surveyed for owls following the fire. A minimum of four visits, spaced at least one week apart, must be conducted before non-occupancy can be inferred. If the PAC is still occupied by owls or if owls are nearby (i.e., within 400m of the PAC boundary), the extent and severity of the fire should be assessed and reconfiguration of the PAC boundaries might be considered through section 7 consultation. If no owls are detected, then section 7 consultation should be used to evaluate the proposed salvage plans. If informal consultation cannot resolve the issue within 30 days, the appropriate RU working team should be brought into the negotiations.

Salvage logging within PACs should be the exception rather than the rule. The Recovery Team advocates the general philosophy of Beschta et al. (1995) for the use of salvage logging. In particular: (1) no management activities should be undertaken that do not protect soil integrity; (2) actions should not be done that impede natural recovery of disturbed systems; and (3) salvage activities should maintain and enhance native species and natural recovery processes. Further, any salvage should leave residual snags and logs at levels and size distributions that emulate those following pre-settlement, stand-replacing fires. Scientific information applicable to local conditions should be the basis for determining those levels.

. . . .

Salvage logging in PACs should be allowed only if sound ecological justification is provided and if the proposed actions meet the intent of this Recovery Plan, specifically to protect existing habitat and accelerate the

> development of replacement habitat. Fires within PACs are not necessarily bad. In many cases, patchy fires will result in habitat heterogeneity and may benefit the owl and its prey. In such cases, adjustments to PAC boundaries are probably unnecessary and salvage should not be done. Salvage should be considered in PACs only when the fire is extensive in size and results in the mortality of a substantial proportion of trees.

[FWS-AR 34, at 84-89.]

7. In 1996, the United States Forest Service (USFS) amended its land-use plans for national forests in Arizona and New Mexico to incorporate special management considerations and protections for the Mexican spotted owl in accordance with the Recovery Plan noted above. [FS-AR 58, at App. D.] The 1996 Forest Plan Amendment was prompted by a biological opinion issued by the USFWS which opined that continued implementation of the forest plans which predated that amendment "will jeopardize the continued existence of the Mexican spotted owl and will adversely modify its critical habitat." [FS-AR 68, at 2.] The USFWS issued a second biological opinion which concluded that the continued existence of the owl was not likely to be jeopardized so long as the USFS abided by the terms and conditions stated in the 1996 Forest Plan Amendment, as well as certain measures specified in the USFWS's biological opinion. [FS-AR 67.]

8. Critical habitat for the Mexican spotted owl on lands outside the national forests in Arizona and New Mexico was designated on February 1, 2001. See Final Designation of Critical Habitat for the Mexican Spotted Owl, 66 Fed. Reg. 8,530, 8,543 (Feb. 1, 2001). National forest lands were initially excluded from the critical habitat designation based on the commitments secured in the 1996 Forest Plan Amendment and the

biological opinion accompanying that amendment.[2]

9. The 1996 Forest Plan Amendment contains the following standards which apply to "protected activity centers" or "PACs" for the Mexican Spotted Owl:

> Survey all potential spotted owl areas including protected, restricted, and other forest and woodland types within an analysis area plus the area ½ mile beyond the perimeter of the proposed treatment area.
>
> Establish a protected activity center at all Mexican spotted owl sites located during the surveys and all management territories established since 1989.
>
> Allow no timber harvest except for fuelwood and fire risk abatement in established protected activity centers. For protected activity centers destroyed by fire, windstorm, or other natural disaster, salvage timber harvest or declassification may be allowed after evaluation on a case-by-case basis in consultation with the US Fish and Wildlife Service.
>
> Allow no timber harvest except for fire risk abatement in mixed conifer and pine-oak forests on slopes greater than 40% where timber harvest has not occurred in the last 20 years.
>
> Limit human activity in protected activity centers during the breeding season.

[FS-AR 58, at App. D.]

10. In its Final Biological Opinion regarding the Mexican Spotted Owl and Critical Habitat and Forest Plan Amendments (Biological Opinion) dated November 25, 1996, the United States Fish and Wildlife Service noted that certain provisions of the 1996 Forest Plan Amendment

---

[2]The designation of critical habitat for the Mexican spotted owl, as well as the decision to exclude national forest lands from that designation, have been the subject of recent litigation. See Ctr. for Biological Diversity v. Norton, 240 F. Supp. 2d 1090, 1091-96 (D. Ariz. 2003) (recounting the history of the litigation concerning this issue); Designation of Critical Habitat for the Mexican Spotted Owl, 68 Fed. Reg. 65,020 (proposed Nov. 18, 2003) (similar).

> [do] not encompass everything needed for the recovery of the owl. . . . . [R]egarding timber salvage within PACs, it must be pointed out that the Recovery Plan states, "If a stand-replacing fire occurs within a PAC, timber salvage plans must be evaluated on a case-specific basis." The FEIS on page 154 states that, salvage timber harvest may be allowed on a case-by-case basis after consultation with the Service. These slight changes in wording can lead to misinterpretations of the general intent of the Recovery Plan. The Recovery Plan gives several cautions to timber salvage in PACs that must be adhered to during planning processes. The terms and conditions of this biological opinion provide additional direction that will ensure that these activities are carried out so that any impacts are minimized. . . . It is crucial that resource managers and biologists on the ground refer to the Recovery Plan in order to correctly interpret the standards and guidelines.

[FS-AR 67, at 21.] The Biological Opinion further provides that:

> the following reasonable and prudent measures are necessary and appropriate to minimize take of the Mexican spotted owl:
>
> . . .
>
> 3. Salvage timber harvest in PACs: Carry out salvage harvest in PACs only when it would improve habitat conditions for the species. When it is determined that habitat conditions for the species would be improved, salvage will be carried out in a way that will minimize the likelihood of injury to individual owls.

[FS-AR 67, at 31.] The Biological Opinion then lists five specific conditions that must be met in order to "minimize the likelihood of injury to individual owls":

> (1) All management activities will protect soil integrity.
> (2) No management activities will be employed that would impede natural recovery of disturbed systems.
> (3) All management activities will maintain and enhance native species and natural recovery processes.
> (4) Residual snags and logs will be left at levels and size distributions that emulate those following pre-settlement, stand-replacing fires. These levels and distributions will be based on available scientific information applicable to local conditions.
> (5) All salvage harvest in PACs will be carried out only during the non-

> breeding season (1 September-28 February) of the Mexican spotted owl, unless to do so would render the harvested timber unmerchantable. This breeding season closure will not apply if it can be determined that the owls in the PAC are not nesting.

[FWS-AR 67, at 33.]

11. Pursuant to the Recovery Plan, a "protected activity center" for the Mexican Spotted Owl known as "the Fenton Lake PAC" was designated in Sandoval Ridge area of the Santa Fe National Forest prior to the summer of 2002. "This PAC has produced one young in 1998; pairs were present, but no young were produced in 1999 or 2000; the PAC was not monitored in 2001, but feathers and pellets were found indicating occupancy; and adult female with two recently fledged young was present in 2002." [FS-AR 46, at 6; FS-AR 26 (e-mail dated 09/09/2002.)]

12. A wildfire known as the "Lakes Fire" was started on August 26, 2002, and eventually burned 3,865 acres of national forest land in the general vicinity of Fenton Lake in the Santa Fe National Forest. [FS-AR 1, at 2.]

13. On September 25, 2002, the USFS began the process of identifying possible areas for salvage logging in the areas burned by the Lakes Fire. [FS-AR-2.]. The USFS subsequently listed the "Lakes and BMG Wildfire Timber Salvage Sale" (Lakes and BMG Sale in the agency's Schedule of Proposed Actions. [FS-AR 45, at 3.]

14. From the outset, the "underlying need" which prompted the USFS to develop the "Lakes and BMG Sale was "to support the economy and wood product needs of northern New Mexico communities." [FS-AR 5; FS-AR 10.] "Specific objectives include

contributing to the regional economy of northern New Mexico by providing forest-based and wood-products manufacturing jobs, and providing citizens with the opportunity to gather wood-products such as posts and poles, firewood, biomass, vigas, and latillas both for resale and personal use." [FS-AR 45, at 1.]

15. The Lakes and BMG Sale includes 9 units in the area where the Lakes Fire occurred and two units in the area burned by another fire known as the "BMG Wildfire." [FS-AR 45, at Map 1.]

16. The site designated as "Unit 6" of the Lakes and BMG Sale is almost entirely within the protected area of Mexican spotted owl habitat known as the "Fenton Lake PAC." [FS-AR 45, at 27; Ex. 1 to Defts.' Resp. to Pl.'s Mot. for T.R.O.]

17. On April 10, 2003, Mexican spotted owls were observed in the Fenton Lake PAC by Jo Wargo of the USFS; she reported these observations to Danney Salas of the USFS, and the two USFS personnel agreed to wait three weeks before conducting another survey to see if the owls were nesting. [FS-AR 43 (e-mails dated 04/10/2003.)]

18. Jo Wargo also met with Santiago Gonzales of the USFWS on April 11, 2003, and, according to Ms. Wargo's account, they decided that:

> the PAC will not be redrawn at this point. We will wait until after we mouse the owls in about three weeks (with repeated mousings at later dates, if necessary, to find nest) to see if they appear to be nesting, and try to find the nest. If we find a nest, at that point we will re-look at maps and decide if the PAC needs to be re-drawn to exclude any burned areas, or not. Santiago also mentioned that it might be good to wait until the burned areas revegetate to see what kind of habitat is coming back--we may not need to re-draw the PAC if we decide that some of the burned areas will serve as good foraging habitat.

[FS-AR 43 (note dated 11 April 2003.)][3]

19. On April 22, 2003, before any additional surveys were completed, Defendant USFS issued its Environmental Assessment (EA) and Biological Assessment/Biological Evaluation (BA/BE) regarding the Lakes and BMG Sale for public comment; the BA/BE also was sent to the USFWS on that date. [FS-AR 45; FS-AR 46.]

20. The EA "grouped and sorted comments received into issues and non-issues. Issues are defined as a concern or debate about the effects of the proposal" and are "further categorized as key issues (used to develop alternatives to the proposed action) and other issues (addressed through mitigation measures common to all alternatives)." [FS-AR 45.]

21. The only "key issue" identified in the EA pertains to the "Jemez Mountains salamander" discussed in Section II.B of this *Memorandum Opinion and Order*, and the peregrine falcon, which inhabits another area of the forest that is not in dispute here. The Mexican spotted owl is not mentioned as a "key issue" in the EA. [FS-AR 45, at 4-5.]

22. The section of the EA entitled "Mitigation Measures Common to All Alternatives" lists the following mitigation measure for the Mexican spotted owl: "Within Unit 6, salvage activities will not occur within the Protected Activity Center for the Mexican spotted owl during the March 1-August 31 breeding season." [FS-AR 45, at 12, citing the Recovery Plan and the 1996 Forest Plan Amendment.]

---

[3] Ms. Wargo's written account of the meeting also contains a number of hearsay statements attributed to Mr. Gonzales which largely accord with the USFWS's later concurrence in the USFS's determination that the sale was not likely to adversely affect the Mexican spotted owl.

23. The Section of the EA entitled "Environmental Consequences" states, in relevant part, that:

> Unit 6 is within an area that was established as a spotted owl Protected Activity Center (nesting habitat) prior to the fire. This PAC was burned at high intensity during the Lakes wildfire, most likely destroying its suitability for future spotted owl breeding until a mixed conifer canopy is once again established. Several surveys for owls were conducted in the Sandoval Ridge area (units 6-8). Two spotted owls were seen in the within the Protected Activity Center, however, it is uncertain whether they are a nesting pair and whether they will find or establish a nest in the same area. Subsequent surveys are planned to make these determinations.
>
> . . .
>
> Salvage logging activities may affect but would not be likely to adversely affect this species. This is because: (1) harvest units do not contain suitable nesting habitat characteristics; (2) a mitigation measure prohibits harvest with the Protected Activity Center during the breeding season as per the *Recovery Plan for the Mexican Spotted Owl*; and (3) harvest units would likely not be used for roosting, as little cover is present, and logging activity would not occur at night when owls would be foraging for food. There would be a slight increase in the risk of great horned owls and red-tailed hawks preying on spotted owls, since harvesting the dead trees creates more open habitat, which results in more ground vegetation and habitat for small mammals, which would attract more predatory bird species. Although snags would be harvested, adequate snags would be retained within the project area to provide spotted owl perch trees for hunting activities. Mitigations retaining down wood would maintain adequate cover for prey populations within the project area.

[FS-AR 45, at 27, 28 (citations omitted).]

24. The environmental consequences described above are reiterated in greater detail in the BA/BE which accompanies the EA. The BA/BE concludes that: " At this time, it is unknown whether th[e Fenton Lake] PAC will remain viable, although consultation with MSO specialists . . . indicates that it is probable that this PAC will not be suitable breeding

habitat until mixed conifer forest cover is once again re-established." [FS-AR 46, at 6.] Under "Mitigation," the BA/BE states that: "Project activities will occur only during the nonbreeding season (September 1 to February 28) within Unit 6 on Sandoval Ridge. Further monitoring to determine if owls are nesting in the PAC will be conducted this spring." [FS-AR 46, at 6.]

25. Based on the rationale cited above, the USFS determined in its BA/BE and EA that the proposed Lakes and BMG Sale was not likely to adversely affect the Mexican Spotted Owl. [FS-AR 45, at 28; FS-AR 46, at 7.]

26. On May 1, 2003, the USFWS issued a letter concurring in the USFS' determination that the proposed Lakes and BMG Sale was not likely to adversely affect the Mexican Spotted Owl "because the project site does not contain breeding habitat, project activities within the Fenton Lake PAC on Sandoval Ridge will be restricted to September 1 to February 28, snag retention and down wood will provide owl prey habitat, and the majority of the burned area will not be salvage logged." [FS-AR 49.] The letter further stated that "the Fenton Lake protected activity center (PAC) was completely destroyed in the 2002 Lake Fire. That PAC may be decommissioned pending survey results. Owl surveys have been and will be conducted before project implementation." [FS-AR 49.]

27. On May 13, 2003, Santiago Gonzales of the USFWS and Jo Wargo of the USFS reported that a recent survey (conducted between May 9, 2003, and May 12, 2003) showed the presence of a nesting pair of Mexican spotted owls in the Fenton Lake PAC. [FS-AR 71; FS-AR 66.]

28. On May 27, 2003, the public comment period ended for the EA associated with the Lakes and BMG Salvage Sale. [FS-AR 53, Comment and Response App. at 1.]

29. On August 1, 2003, Jo Wargo of the USFS sent an e-mail to Santiago Gonzales of the USFWS and Lee Johnson of the USFS stating as follows:

> Terry Johnson and I went in on Tuesday night, July 29, to check for evidence of young. We checked the nest site which we had found earlier in the summer when we moused. Terry found lots of feathers. We found many pellets – most with woodrat bones, some with beetles. There was evidence of roosting on many ledges - about 8-10 - with lots of whitewash. We called NE of the nest site with no response; then called at the nest site. We heard a response to the southwest. We walked in that direction into the next drain and called again. We saw and heard at least two young. They were flying back and forth around us, calling, and perching on a tree in front and behind us and rocks next to us. There may have been a third (we thought we heard a third once or twice), but we only had visual and auditory confirmation for two. An adult flew in once, so it's possible he/she fed the third, so it did not call again or fly around with the other two, but we had no confirmation. So at least we know there are two. The area they are in is SW of the nest in a drain where there was less fire damage and still quite a few green trees high up on the canyon side.

[FS-AR 71.] This information is also reported in Jo Wargo's field notes. [FS-AR 66.]

30. On August 9, 2003, the USFS published its Decision Notice and Finding of No Significant Impact (FONSI) for the Lakes and BMG Sale. [FS-AR 54.] The Decision Notice selected the alternative that "provides the greatest amount of salvage wood products among the action alternatives," again citing the need to contribute "to the regional economy of northern New Mexico by providing forest-based wood-products to support industry and manufacturing jobs." [FS-AR 53, at 1.]

31. The selected alternative included Unit 6 (which is almost entirely within the Fenton Lake PAC), noting that "the mitigation measures included as part of the proposed action (Alternative 2) would meet standards and conservation measures to protect wildlife species" and that "[c]onsultation with the United States Fish and Wildlife Service has been completed and they concurred with the resource specialist's determination of *may affect, not likely to adversely affect*." [FS-AR 53, at 3, 5.] An alternative that would have deleted this unit from the sale "to address wildlife concerns" was not selected. [FS-AR 53, at 2-3.]

32. The Decision Notice and FONSI make no reference to the information about the owls nesting and breeding in the Fenton Lake PAC that was reported in surveys conducted after the BA/BE and EA were issued on April 22, 2003. The Decision Notice and FONSI neither cite nor contain any finding that the selected alternative would improve habitat conditions for the Mexican spotted owl. The issues of whether the boundaries of the Fenton Lake PAC should be re-drawn, or whether some of the burned area will serve as good foraging habitat for the Mexican spotted owl (as suggested in Jo Wargo's notes of April 11, 2003), also are not addressed in the Decision Notice and FONSI. [FS-AR 53.]

33. On September 22, 2003, Plaintiffs filed an administrative appeal regarding the Lakes and BMG Sale pursuant to 36 C.F.R. § 215. In their administrative appeal, Plaintiffs alleged violations of the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act "in regard to protection of the Mexican spotted owl." [FS-AR 56, at 3, 5-6, 8, 11-13.]

34. On November 7, 2003, the Appeal Deciding Officer affirmed the agency's Decision Notice, EA, and FONSI regarding the Lakes and BMG Sale. [FWS-AR 33.]

35. As grounds for affirming the agency's action, the Review and Findings of the USFS Appeal Deciding Officer cite the information provided in the BA/BE and also state that: "Visits and surveys (PR #66) to the area of the PAC since the fire have not recorded any occupancy by an MSO." [FWS-AR 33, at 3-4.] This statement is contrary to the actual survey data in the administrative records during the period from April 10, 2003, to August 1, 2003, which record occupancy by a breeding pair of Mexican spotted owls and their offspring. [FS-AR 43 (e-mails dated 04/10/2003); FS-AR 71; FS-AR 66.]

36. On January 6, 2004, Plaintiffs filed this civil action seeking declaratory, mandatory, and injunctive relief with respect to the Lakes and BMG Sale. [Doc. No. 1.] Plaintiffs amended their *Complaint* on January 13, 2004. [Doc. No. 8, 9.]

37. On the afternoon of Friday, January 9, 2004, Plaintiffs filed a motion for a termporary restaining order in this matter. [Doc. No. 2.] The information sheet accompanying the motion requested a hearing with notice to Defendants by no later than Wednesday, January 14, 2004.

38. The Court held a hearing on *Plaintiffs' Motion for Temporary Restraining Order* on January 14, 2004, at which Plaintiffs' counsel was present and Defendants' counsel of record appeared telephonically at his request, and with leave of the Court.

39. At the conclusion of the hearing on January 14, 2004, the Court issued a *Temporary Restraining Order* [Doc. No. 13] immediately enjoining and restraining

Defendants from all ground-disturbing work (except removal of downed timber) in Unit 6 of the Lakes and BMG Sale until 6:30 p.m. on January 30, 2004. The Court's *Temporary Restraining Order* denied *Plaintiffs' Motion for Temporary Restraining Order* in all other respects and set a briefing schedule, as well as a procedure for designating an administrative record, with respect to *Plaintiffs' Motion for Preliminary Injunction*.

40. Timber-harvesting activities were underway in Unit 6 until shortly after the *Temporary Restraining Order* was issued. [Doc. No. 17; Defts.' Resp. at 2 n.2.]

**B. Jemez Mountains Salamander**

41. The Jemez Mountains salamander is not listed as a threatened or endangered species under the ESA; however, the USFS has entered into a "Cooperative Management Plan for the Jemez Mountains Salamander on Lands Administered by the Forest Service" (Cooperative Management Plan), which has been incorporated into the USFS' Forest Plan. [FS-AR 30.]

42. Units 6, 7, and 8 of the Lakes and BMG Wildfire Timber Salvage Sale occur in an area designated in the Cooperative Management Plan as "the Essential Zone" of the Jemez Mountains salamander. [FS-AR 30, at 17; FS-AR 46, Addendum.]

43. The Cooperative Management Plan provides that:

> The management objective within the Essential Zone is the conservation and sustainability of the Jemez Mountains salamander and its habitat. Ecosystem management plans will include goals for the perpetuation and conservation of Jemez Mountains salamander populations. Actions that adversely impact the Jemez Mountains salamander will not generally be conducted within the Essential Zone; however, activities may be considered that are designed to develop sustainable habitat for long-term maintenance of Jemez Mountains

salamander populations.

[FS-AR 30, at 17.]

44. The Jemez Mountains salamander was identified as a "key issue" in the EA for the Lakes and BMG Sale and specific measures designed to address the salamander's habitat needs were addressed in the EA and the BA/BE for this sale. [FS-AR 45, at 4.]

45. During the public comment period, the USFS received comments from the New Mexico Endemic Salamander Team and the New Mexico Department of Game and Fish regarding the adequacy of the measures identified in the EA and the BA/BE. [FS-AR 50.]

46. In response to the concerns raised by these commenters, the USFS issued addendums to the EA and BA/BE which added further measures designed to address the salamander's habitat needs. [FS-AR 46, at Addendum and Addendum #2.]

47. In its Decision Notice and FONSI, the USFS found that, with the addition of these measures, the Lakes and BMG Sale was not likely to adversely affect the salamander and would "enhance salamander habitat (by immediately providing slash and down logs)." [FS-AR 53, at 5.]

48. Plaintiffs appealed the USFS's decision to proceed with the sale in Units 6, 7, and 8 as noted above.

## II. <u>LEGAL ANALYSIS</u>

### A. <u>Jurisdiction and Standard of Review</u>

The decision of the USFS to proceed with the Lakes and BMG Sale, in conjunction with the Biological Assessment/Biological Evaluation (BA/BE), Environmental Assessment

(EA), and concurrence letter of the USFWS [FS-AR 45, 46, 49, 53; FWS-AR 33], constitutes a final agency action subject to judicial review by this Court under the standard set forth in Section 706 of the Administrative Procedures Act (APA), 5 U.S.C. § 706 (2000), and the procedural framework set forth in Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994). See Friends of the Bow v. Thompson, 124 F.3d 1210, 1217 (10th Cir. 1997) (reviewing NFMA and NEPA claims); Wyo. Farm Bureau Fed. v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000) (reviewing ESA claim); Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1033-34 (9th Cir. 2000) (similar).

Plaintiffs have exhausted their administrative remedies with respect to their claims against the USFS as required under 5 U.S.C. § 704, 7 U.S.C. § 6912(e), and 36 C.F.R. § 215.21.[4] See Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002); Utah Shared Access Alliance v. Wagner, 98 F. Supp. 2d 1323, 1332-33 (D. Utah 2000), aff'd, 288 F.3d 1205 (10th Cir. 2002). This Court has jurisdiction over the parties

[4]Defendants note that Plaintiff did not file a notice of intent to sue sixty days before filing this action pursuant to the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g). [Defts.' Resp. at 7 n.2.] The Court does not find the sixty-day notice requirement of the ESA's citizen-suit provision to be dispositive in this instance because Plaintiffs properly exhausted their administrative remedies under the USFS's administrative appeal procedure, and the statutory requirements of the ESA, NFMA, and NEPA are so interrelated as to preclude separate analysis under the particular circumstances of this case. Additionally, "[a] court may excuse exhaustion if administrative remedies would be futile" or "when administrative remedies would provide inadequate relief." Bryan v. Office of Personnel Mgmt., 165 F.3d 1315, 1319 n.4 (10th Cir. 1999); accord Silver v. Babbitt, 924 F. Supp. 976, 987 (D. Ariz. 1995). Further exhaustion appears to be futile or inadequate here inasmuch as the USFS intends to complete the timber sale before the sixty-day notice period expires.

and the subject matter of this action, and Defendants were afforded notice and an opportunity to respond to *Plaintiffs' Motion for Preliminary Injunction* as required by Fed. R. Civ. P. 65(a).

Section 706 of the APA provides, in relevant part, that: "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously under this standard if it "entirely fails to consider an important aspect of the problem" or "offers an explanation for its decision that runs counter to the evidence before it or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see Pac. Coast Fed'n of Fishermen's Ass'ns, Inc., 265 F.3d at 1034 (applying this standard to proposed timber sales and noting that "[a] biological opinion may also be invalid if it fails to use the best available scientific information as required by §16 U.S.C. § 1536(a)(2)"); Earth Island Inst. v. United States Forest Serv., 351 F.3d 1291, 1304 (9th Cir. 2003) (applying this standard to the delisting of a "PAC" for the California spotted owl that was not in compliance with the applicable forest plan).

While the Court's review of Defendants' actions under this standard is a deferential one that does not displace the agency's choice between two fairly conflicting views so long as that choice is supported by substantial evidence, see Wyo. Farm Bureau Fed., 199 F.3d at 1231, the Court's review is not so forgiving as to allow the agency to disregard those facts

or issues that prove difficult or inconvenient, or refuse to come to grips with the result to which those facts or issues lead, see Sea Robin Pipeline Co. v. F.E.R.C., 127 F.3d 365, 370 (5th Cir. 1997). Similarly, the "arbitrary and capricious" standard does not allow the agency to select and discuss only that evidence which favors its ultimate conclusion or fail to consider an entire line of evidence to the contrary. See Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). "[S]tatutory interpretation and the application of law [also] must withstand an arbitrary and capricious standard of review." Bd. of County Comm'rs v. Isaac, 18 F.3d 1492, 1496 (10th Cir. 1994).

The Tenth Circuit has observed that "an agency must articulate the grounds for its decision with enough detail to enable the reviewing court to determine whether the agency considered the relevant factors and made a reasonable choice." Id. at 1496. Further, the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; accord Olenhouse, 42 F.3d at 1574; see also Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626 (1986) (plurality opinion) (noting that the Court will not uphold administrative action simply because it is possible to conceive a basis for it).

"The agency must make plain its course of inquiry, its analysis and its reasoning. After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles." Olenhouse, 42 F.3d at 1575 (citation omitted). Thus, the agency's action "cannot be sustained on a ground appearing in the record to which the agency made no reference; to the contrary, the [agency's] decision stands or falls on its

express findings and reasoning." NLRB v. Indianapolis Mack Sales & Serv., Inc., 802 F.2d 280, 285 (7th Cir. 1986); accord Olenhouse, 42 F.3d at 1575.

## B. Unit 6 and the Fenton Lake PAC for the Mexican Spotted Owl

The Court first addresses the merits of Plaintiffs' claims with respect to Unit 6 of the Lakes and BMG Sale and its impact on the Mexican spotted owl. The legal basis for these claims is found in the consistency requirements stated in Section 6 of the National Forest Management Act (NFMA), 16 U.S.C. § 1604(i) (2000), the consultation requirements stated in Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536 (2000), and the procedural requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370f; 40 C.F.R. pts. 1500-1508. As explained below, Plaintiffs' claims under these statutes are so interrelated in this instance as to preclude separate analysis.

Section 7(a)(2) of the ESA states, in relevant part, that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species. . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). Section 7(d) of the ESA further provides that:

> After initiation of consultation required under subsection (a) (2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a) (2) of this section.

16 U.S.C. § 1536(d). With regard to the Mexican spotted owl, these statutory requirements are implemented through federal regulations issued by the United States Fish and Wildlife Service (USFWS). See 50 C.F.R. pt. 402 (2002).

These regulations provide that the "[c]onsultation, conference, and biological assessment procedures under [S]ection 7 may be consolidated with interagency cooperation procedures required by other statutes, such as the National Environmental Policy Act (NEPA)." 50 C.F.R. § 402.06(a) (citation omitted). In this instance, the consultation process under Section 7 of the ESA was consolidated with the USFS's environmental analysis under NEPA.

Defendants obligations under Section 7 of the ESA also are conjoined with their obligations under Section 6 of NFMA in this instance. Section 6 of NFMA provides that, upon their approval, national forest plans and amendments to those plans provide the basis for all subsequent activities in the national forests, and all permits, contracts, and other instruments for the use and occupancy of the national forest system lands must be consistent with these forest plans and amendments. See 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10; Forest Service Manual § 2213; Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1168 (10th Cir. 1999); Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998); Forest Guardians v. Veneman, Civ. No. 01-0504 MCA/KBM, slip. op. at 8, 31 (D.N.M. Dec. 31, 2002).

In this case, there exists a 1996 amendment to the forest plan for the Santa Fe National Forest which contains specific standards for the management of the Mexican

spotted owl and it habitat. [FS-AR 58, at App. D.] This amendment resulted from a consultation between the USFS and the USFWS pursuant to their obligations under Section 7 of the ESA. [FS-AR 67, 68.]

In this context, the standards regarding the Mexican spotted owl contained in the 1996 Forest Plan Amendment are nondiscretionary. See Veneman, Civ. No. 01-504 MCA/KBM, supra, slip. op. at 34-36; Forest Guardians v. United States Forest Serv., 180 F. Supp. 2d 1273, 1278-80 (D.N.M. 2001). Insofar as the standards contained in the 1996 Forest Plan Amendment are necessary to avoid a jeopardy determination under the ESA, the "reasonable and prudent alternatives" as well as the "terms and conditions" stated in the USFWS's Biological Opinion regarding the 1996 Forest Plan Amendment also are "non-discretionary" in this case. [FS-AR 67, at 29, 31.]

The Biological Opinion for the 1996 Forest Plan Amendment states that: "It is crucial that resource managers and biologists on the ground refer to the Recovery Plan in order to correctly interpret the standards and guidelines" contained in the 1996 Forest Plan Amendment. [FS-AR 67, at 21.] Thus, the management recommendations contained in the Recovery Plan for the Mexican spotted owl [FWS-AR 34] are highly relevant to the task of interpreting the non-discretionary legal requirements set forth in the 1996 Forest Plan Amendment and the Biological Opinion accompanying that amendment.

Both parties appear to rely on the 1996 Forest Plan Amendment, the Biological Opinion accompanying that amendment, and the Recovery Plan for the Mexican spotted owl to provide the legal framework and relevant agency interpretations applicable to Defendants'

decision-making with regard to the Fenton Lake PAC in this case. In particular, counsel for Defendants relies on Guideline No. 8 of the Recovery Plan, as well as the terms and conditions stated in the Biological Opinion accompanying the 1996 Forest Plan Amendment, as grounds for permitting salvage logging in areas designated as "protected activity centers" for the Mexican spotted owl.

The Court agrees that the three documents cited above, all of which appear in the Administrative Record, provide the legal framework and agency interpretations relevant to determining the merits of Plaintiffs' claims with regard to Unit 6 and the Fenton Lake PAC in this case. Under this framework, Defendants must provide "sound ecological justification" for engaging in timber-harvest practices within a "protected activity center" for the Mexican spotted owl because "[p]ast, current, and future timber-harvest practices ... were cited as the primary factors leading to listing the Mexican spotted owl as a threatened species" under the ESA, and "protected activity centers" for Mexican spotted owls are afforded the highest degree of protection under the owl's Recovery Plan. [FWS-AR 34, at 2, 84, 89.] Further, such justification must appear in the "express findings and reasoning" of the agency's decision itself because Section 706 of the APA does not authorize the Court or counsel to provide their own justifications for the agency's action after the fact. See Indianapolis Mack Sales & Serv., Inc., 802 F.2d at 285; Olenhouse, 42 F.3d at 1575.

Based on its review of the Administrative Record, the Court concludes that Defendants' express findings and reasoning in support of their decision to proceed with the timber sale in Unit 6 lack the sound justification necessary to survive judicial scrutiny under

Section 706 of the APA. The basic problem with Defendants' decision-making with respect to this unit of the timber sale is that it fails to account for the agencies' own survey results documenting the presence of a nesting and breeding pair of Mexican spotted owls and their offspring in an area of the Fenton Lake PAC that still contained green trees during the Summer of 2003. These survey results are contrary to the rationale provided in the BA/BE, in the EA, and in the USFWS's concurrence letter of May 1, 2003, all of which expressly rely in part on the premise that the Fenton Lake PAC was completely destroyed and no longer provided suitable breeding habitat for the Mexican spotted owl after the Lakes Fire.[5] In addition, there is no mention of these survey results in the Decision Notice and FONSI, or in the Review and Findings of the Appeal Deciding Officer, even though these documents were issued after the survey results became available to Defendants.

It is arbitrary and capricious for Defendants to rely on the premise that the Fenton Lake PAC was completely destroyed and no longer provides suitable breeding habitat for the owl when the undisputed evidence before the agencies demonstrates that the owl continues to successfully breed in this PAC after the Lakes Fire. Reliance on such a premise is arbitrary and capricious because it "offers an explanation for [the agency's] decision that

---

[5]In this regard, the EA states that: "This PAC was burned at high intensity during the Lakes wildfire, most likely destroying its suitability for future spotted owl breeding until a mixed conifer canopy is once again established." [FS-AR 45, at 27.] The BA/BE also states that: "At this time, it is unknown whether this PAC will remain viable, although consultation with MSO specialists . . . indicates that it is probable that this PAC will not be suitable breeding habitat until mixed conifer forest cover is once again re-established." [FS-AR 46, at 6.] And the USFWS's concurrence letter states that "the Fenton Lake protected activity center (PAC) was completely destroyed in the 2002 Lake Fire" and that "the project site does not contain breeding habitat" for the Mexican spotted owl. [FS-AR 49.]

runs counter to the evidence before it or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. As noted above, the "arbitrary and capricious" standard in Section 706 of the APA does not permit an administrative agency to select and discuss only that evidence which favors its ultimate conclusion and fail to consider an entire line of evidence to the contrary. See Herron, 19 F.3d at 333.

At the hearing on January 30, 2004, counsel for Defendants asserted that the agencies' decision-making with respect to Unit 6 of the Lakes and BMG Sale is not arbitrary and capricious because it does not rely on the premise that the owls would no longer nest and breed in the Fenton Lake PAC after the Lakes Fire. According to defense counsel, the survey results which contradict this premise are irrelevant because, even before those survey results were available, the agencies anticipated and planned for a "worst-case scenario" in which the owls would continue to nest and breed in the PAC.

The Court concludes that these after-the-fact assertions of counsel are not supported by the Administrative Record and do not comport with the legal framework set forth in the 1996 Forest Plan Amendment, the Biological Opinion accompanying that amendment, and the Recovery Plan for the Mexican spotted owl. The rationale stated by the agencies at the time of their decision-making does not rely exclusively on breeding-season restrictions or other mitigation measures to support their conclusion that the timber sale in Unit 6 is not likely to adversely affect the Mexican spotted owl. Rather, as noted above, the rationale stated in the EA, the BA/BE, and the USFWS's concurrence letter of May 1, 2003, expressly

relies in part on the premise that the Fenton Lake PAC would no longer provide suitable breeding habitat for the owl after the Lakes Fire. [FS-AR 45, at 27; FS-AR 46, at 6; FS-AR 49.] The rationale stated in each of these documents also expressly relies in part on the agencies' commitment to conduct further surveys during the breeding season.[6] The agencies' reasons for omitting or discounting the results of these surveys (if such reasons exist), are not stated or explained in the Decision Notice and FONSI or in the Review and Findings of the Appeal Deciding Officer. [FS-AR 53; FWS-AR 33.]

Counsel's assertion concerning the irrelevance of the survey results also is not consistent with the agencies' own documents acknowledging the significance of such surveys. The Recovery Plan for the Mexican spotted owl and the Biological Opinion accompanying the 1996 Forest Plan Amendment both make a clear distinction between PACs that are still occupied by owls after a fire and those that are not. Indeed, Guideline No. 8 of the Recovery Plan requires the agencies to make such a distinction by directing that "the PAC and a buffer extending 400 m from the PAC boundary must be surveyed for owls following the fire" in all cases where a timber-salvage plan is contemplated in an existing PAC where a stand-replacing fire has occurred. [FWS-AR 34, at 88.] Under Guideline No. 8 of the Recovery Plan, the determination of whether a PAC is occupied by owls is relevant

[6]In this regard, the EA states that: "Subsequent surveys are planned to make these determinations." [FS-AR 45, at 27.] In a sentence that begins with the heading, "Mitigation," the BA/BE states that: "Further monitoring to determine if owls are nesting in the PAC will be conducted this spring." [FS-AR 46, at 6.] The USFWS's concurrence letter states that: "Owl surveys have been and will be conducted before project implementation." [FS-AR 49.]

to the agencies' evaluation of whether to proceed with a salvage-timber sale and whether to reconfigure the PAC's boundaries after a fire. [FWS-AR 34, at 88.] Under the terms and conditions stated in the Biological Opinion accompanying the 1996 Forest Plan Amendment, the determination of whether owls are nesting in a PAC after a fire also is relevant to determining whether breeding-season restrictions are a necessary condition of salvage-timber plans. [FS-AR 67, at 33.]

According to the Biological Opinion, however, such breeding-season restrictions are not the only conditions that must be satisfied before a salvage-timber sale may proceed in an occupied PAC. The Biological Opinion also provides that:

> the following reasonable and prudent measures are necessary and appropriate to minimize take of the Mexican spotted owl:
>
> . . .
>
> 3. Salvage timber harvest in PACs: Carry out salvage harvest in PACs only when it would improve habitat conditions for the species. When it is determined that habitat conditions for the species would be improved, salvage will be carried out in a way that will minimize the likelihood of injury to individual owls.

[FS-AR 67, at 31.] The Biological Opinion lists four specific conditions (in addition to the breeding-season restrictions noted above) that must be met in order to "minimize the likelihood of injury to individual owls":

> (1) All management activities will protect soil integrity.
> (2) No management activities will be employed that would impede natural recovery of disturbed systems.
> (3) All management activities will maintain and enhance native species and natural recovery processes.
> (4) Residual snags and logs will be left at levels and size distributions that

> emulate those following pre-settlement, stand-replacing fires. These levels and distributions will be based on available scientific information applicable to local conditions.

[FWS-AR 67, at 33.]

Defendants' decision to proceed with salvage logging in Unit 6 of the Lakes and BMG Sale does not rest on an express determination that this logging will "improve habitat conditions" for the Mexican spotted owl and that each of the four additional conditions listed above have been satisfied.[7] Indeed, the EA and BA/BE for the Lakes and BMG Sale acknowledge that this timber sale would produce "a slight increase in the risk of great horned owls and red-tailed hawks preying on spotted owls" [FS-AR 45, at 28; FS-AR 46, at 6], and the Biological Opinion accompanying the 1996 Forest Plan Amendment is not even referenced in the EA, the BA/BE, the USFWS's concurrence letter dated May 1, 2003, the Decision Notice and FONSI, or the Review and Findings of the Appeal Deciding Officer. [FS-AR 45, at 46-50; FS-AR 46, at 16-18; FS-AR 49; FS-AR 53; FWS-AR 33.]

Under Section 706 of the APA, the agency's decision "cannot be sustained on a ground appearing in the record to which the agency made no reference; to the contrary, the [agency's] decision stands or falls on its express findings and reasoning." Indianapolis Mack

[7]The Court notes that the issue of snag retention is addressed in the Administrative Record; however, there is no express finding as to whether residual snags and logs will be left at levels and size distributions that emulate those following pre-settlement, stand-replacing fires. On the contrary, Defendants appear to acknowledge that: "In combination with the stand-replacing fire and the current proposal for salvage logging, numbers of large diameter snags and down woody debris could be lower than would normally be present post-fire." [FS-AR 46, at 14-15; see also FS-AR 45, at 37.]

Sales & Serv., Inc., 802 F.2d at 285; accord Olenhouse, 42 F.3d at 1575. Similarly, "[a]n agency must articulate the grounds for its decision with enough detail to enable the reviewing court to determine whether the agency considered the relevant factors and made a reasonable choice." Isaac, 18 F.3d at 1497.

For these reasons, the Court cannot simply infer that by including breeding-season restrictions as a mitigation measure, Defendants meant to say that salvage logging in Unit 6 would actually "improve" habitat conditions for the Mexican spotted owl. "Mitigation" means "[t]o make less severe"; it does not mean "to improve." See Black's Law Dictionary at 1002 (6th ed. 1990).

Further, the inquiry here is not simply a matter of semantics. According to the Recovery Plan, "[p]ast, current, and future timber-harvest practices . . . were cited as the primary factors leading to listing the Mexican spotted owl as a threatened species." [FWS-AR 34, at 2.] The Recovery Plan also states that "[s]alvage logging within PACs should be the exception rather than the rule," and that such an exception requires "sound ecological justification." [FWS-AR 34, at 88, 89.] Given this language, the Court will not assume that salvage logging will improve habitat conditions for the owl, and that each of the mitigation measures specified in the Biological Opinion have been satisfied, where the agency has failed to make its own express findings to this effect.

In sum, the Court concludes that Defendants' decision to proceed with salvage logging in Unit 6 of the Lakes and BMG Sale without further analysis or consultation under the relevant statutes is arbitrary, capricious, and not in accordance with law for the following

reasons. First, Defendants did not consider and account for the actual presence of a pair of Mexican spotted owls and their offspring in the Fenton Lake PAC during the Summer of 2003, and therefore their decision-making is arbitrary, capricious, and not in accordance with law because it fails to consider an important aspect of the problem and runs contrary to the undisputed evidence before the agency. Second, to the extent that Defendants considered and planned for the owls' occupancy of the Fenton Lake PAC after the fire (as argued by Defendants' counsel at the hearing), their decision-making is arbitrary, capricious, and not in accordance with law because it lacks the required determination that the salvage-timber harvest would "improve" habitat conditions for the Mexican spotted owl, does not adequately address four of the five required mitigation measures, or, in the alternative, does not comply with the necessary procedure for reconfiguring the PAC boundaries to exclude Unit 6. It follows that Plaintiffs prevail on the merits of their interrelated claims under NFMA, NEPA, and the ESA concerning the Mexican spotted owl and Unit 6 of the Lakes and BMG Sale.

### C. <u>The "Essential Zone" of the Jemez Mountains Salamander</u>

The Court next turns to the merits of Plaintiffs' claims regarding the Jemez Mountains salamander. These claims implicate Units 7 and 8 of the Lakes and BMG Sale, in addition to Unit 6 discussed above. The legal grounds for Plaintiffs' claims regarding the salamander are more limited, however, because the Jemez Mountains salamander is not listed as a threatened or endangered species under the ESA.

The Court determines that Plaintiffs do not succeed on the merits of their claims regarding the Jemez Mountains salamander in this case because, in stark contrast to the

issues pertaining to the Mexican spotted owl discussed above, the Administrative Record adequately and explicitly supports Defendants' analysis regarding the effects of the Lakes and BMG Sale on this species of salamander. In particular, it appears that the USFS has satisfied their obligations under NEPA with respect to the Jemez Mountains salamander by identifying the impact on the salamander as a "key issue" in their environmental assessment and preparing two addendums and a decision rationale which responded in a specific and timely manner to the comments raised during the public comment period. [FS-AR 46, 52.] The Administrative Record shows that the agency took a "hard look" at the effects of the timber sale on the Jemez Mountains salamander, as required by NEPA, before proceeding with that sale. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

For purposes of analyzing Defendants' compliance with NFMA, the Court assumes for purposes of analysis that the management considerations listed in the "Cooperative Management Plan for the Jemez Mountains Salamander on Lands Administered by the Forest Service" (Cooperative Management Plan) are binding on the USFS to the extent that they have been incorporated into the Forest Plan for the Santa Fe National Forest. [FS-AR 30.] Nevertheless, the Court determines that Plaintiffs do not succeed on the merits of their claim with respect to any duty that NFMA may impose on the USFS regarding compliance with this Cooperative Management Plan. In this regard, the Court again notes that the USFS has implemented a series of measures listed in the Environmental Assessment (BA/BE) and in two subsequent addendums which are designed to ensure compliance with the Cooperative Management Plan. In addition to mitigating the damage to salamander populations caused

by the salvage-logging activity, the USFS's Decision Notice expressly finds that the measures imposed in this case will enhance the immediate habitat needs of the salamander. [FS-AR 53, at 5.]

While the Court treats the Cooperative Management Plan developed by the New Mexico Endemic Salamander Team as if it were binding on all actions of the USFS, the Court does not construe this Cooperative Management Plan as requiring the USFS to obtain the express concurrence of each member of the New Mexico Endemic Salamander Team, or giving each of the team members "veto power" over actions of the USFS, at the site-specific project level. In this respect, the implementation of the Cooperative Management Plan may differ from the consultation process under Section 7 of the ESA.

Under the standard of review articulated in Section 706 of the APA, it is not the Court's role to displace an agency's choice between two conflicting views expressed by members of the scientific community, so long as the agency's choice is supported by substantial evidence and express findings which supply a reasoned basis for its decision. See Wyo. Farm Bureau Fed., 199 F.3d at 1231. Under the particular circumstances of this case, the Court determines that such deference to the agency's choice between conflicting scientific views regarding the effects of the timber sale on the Jemez Mountains salamander is warranted. Therefore, the agency's decision is affirmed with respect to each unit of the Lakes and BMG Sale except Unit 6.

**D. Injunctive Relief**

As the parties have stipulated that the hearing on *Plaintiffs' Motion for Preliminary Injunction* is to be consolidated with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2), the discussion of the merits of Plaintiffs' claims largely determines the scope of the injunctive relief that is warranted in this case. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987) (noting that plaintiffs must show actual success on the merits in order to justify permanent injunctive relief). Nevertheless, the Court briefly addresses the other reasons why injunctive relief is warranted as to Unit 6 of the Lakes and BMG Sale and not warranted as to the other units of this timber sale.

In addition to a substantial likelihood of success on the merits, preliminary injunctive relief generally must be based on a showing (1) that a significant risk of irreparable harm will result if such relief is not granted, (2) that the threatened injury to the movant's interests outweighs the harm that granting such relief may cause to the opposing party's interests, and (3) that the public interest will not be adversely affected by granting such relief. See Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1255, 1258 (10th Cir. 2003). The Court concludes that these requirements have been satisfied with respect to further ground-disturbing work in Unit 6 of the Lakes and BMG Sale and its effect on the Mexican spotted owl.

It follows from the preceding discussion of the merits of Plaintiffs' claims that there is a significant risk of irreparable environmental harm to the Mexican spotted owl and its habitat if an injunction does not issue with respect to Unit 6. In addition to the general

findings and principles of habitat management stated in the owl's Recovery Plan, this determination is based on (1) the recent data indicating the presence of a breeding pair of Mexican spotted owls in the Fenton Lake PAC, (2) the large degree of overlap between the Fenton Lake PAC and Unit 6 of the Lakes and BMG Sale, and (3) the timing of the timber harvesting activity in this unit of the sale, which was already underway when the *Temporary Restraining Order* was issued. [Doc. No. 17.]

While irreparable harm is not presumed simply because Plaintiffs assert a cause of action under an environmental protection statute, a factual showing of "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co., 480 U.S. at 545. Consequently, when environmental injury is "sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." Id. at 545.

Further, the Supreme Court has held that the ESA "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184-185 (1978). In enacting the ESA, Congress also recognized that "the preservation of a species' habitat is essential to the preservation of the species itself." Ctr. for Biological Diversity, 240 F. Supp. 2d at 1098 (citing H.R. Rep. No. 94-887, at 3 (1976), and Tenn. Valley Auth., 437 U.S. at 179). For these reasons, courts have held that "[t]he 'language, history, and structure' of the ESA demonstrate Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species" when considering motions for preliminary

injunctive relief in this context. Nat'l Wildlife Fed'n v. Burlington Northern R.R., 23 F.3d 1508, 1511 (9th Cir.1994) (citing Tennessee Valley Auth., 437 U.S. at 174); Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir.1997).

As noted above, the underlying need which prompted the USFS's decision to proceed with the Lakes and BMG Sale consists of helping to sustain the timber industry as well as supplying firewood and other forest products to local and area residents. [FS-AR 45, at 1; FS-AR 53, at 1.] It is appropriate for Defendants to consider these social and economic benefits to the local economy in their decision-making. However, foregoing these benefits in a single unit of the timber sale (without restriction on timber harvesting in other units of the sale) does not constitute the type of irreparable harm that would outweigh the irreparable environmental harm to a species protected by the ESA in this context.

In light of the foregoing, the Court determines that the threatened irreparable environmental harm to Plaintiffs' interests outweighs the social or economic harm that issuance of a preliminary injunction regarding Unit 6 may cause to Defendants' other interests. The Court further determines that the issuance of an injunction regarding Unit 6 would not be contrary to the public interest in light of the congressional intent expressed in the ESA.

The Court reaches a different conclusion with respect to the Jemez Mountains salamander and the other units of the Lakes and BMG Sale. As Plaintiffs do not prevail on the merits of their claims regarding the Jemez Mountains salamander, it follows that they are not entitled to permanent injunctive relief with respect to these other units. See Amoco Prod.

Co., 480 U.S. at 546 n.12. Further, the Court determines that Plaintiffs have not made a showing of irreparable harm with respect to the salamander and the other units of the timber sale in light of the specific mitigation and habitat-enhancement measures that the USFS has committed to implementing for the benefit of the salamander. Even assuming, for purposes of analysis, that the balance of hardships and the public interest weigh in Plaintiffs' favor with respect to the salamander, these considerations are outweighed in this instance by the absence of a showing of irreparable harm and the lack of success on the merits as to this issue.

## III. CONCLUSION

As stated above, it is not the Court's role to set policy for the USFS or the USFWS with respect to the broad issue of whether salvage timber sales may ever be conducted in "protected activity centers" occupied by Mexican spotted owls or in the "essential zone" of the Jemez Mountains salamander. Nor is it the Court's role to endorse one scientific view of the environmental consequences of salvage logging over another. Rather, the ruling which is made is specific only to the facts of this case as presented in the Administrative Record.

Based on the foregoing review of the Administrative Record, *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 10] is granted in part and denied in part. The hearing on Plaintiff's motion is consolidated with the trial on the merits pursuant to the parties' *Stipulation* [Doc. No. 28] and Fed. R. Civ. P. 65(a)(2). With regard to the Mexican spotted owl and Unit 6 of the Lakes and BMG Wildfire Timber Salvage Sale, the Court concludes that Plaintiffs prevail on the merits of their claims and are entitled to both preliminary and

permanent injunctive relief enjoining all further ground-disturbing work in Unit 6. With regard to the Jemez Mountains salamander and the other units of the Lakes and BMG Sale, the Court concludes that Plaintiffs do not prevail on the merits of their claims and are not entitled to injunctive relief.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion for Preliminary Injunction* [Doc. No. 10] is **GRANTED IN PART** with respect to Unit 6 of the Lakes and BMG Wildfire Timber Salvage Sale and **DENIED IN PART** with respect to the other units of this timber sale.

**IT IS FURTHER ORDERED** that the hearing on *Plaintiff's Motion for Preliminary Injunction* [Doc. No. 10] is **CONSOLIDATED** with the trial on the merits pursuant to the parties' *Stipulation* [Doc. No. 28] and Fed. R. Civ. P. 65(a)(2).

**IT IS FURTHER ORDERED** that the agency action which is the subject of *Plaintiffs' First Amended Complaint* [Doc. No. 8, 9] is **HELD UNLAWFUL AND SET ASIDE IN PART** with regard to Unit 6 of the Lakes and BMG Wildfire Timber Salvage Sale, and **AFFIRMED IN PART** with regard to all other units of this timber sale.

**IT IS FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with Defendants who receive actual notice of this Order by personal service or otherwise, are hereby **IMMEDIATELY ENJOINED AND RESTRAINED** from all further ground-disturbing work in Unit 6 of the Lakes and BMG Wildfire Timber Salvage Sale until such time as they

demonstrate compliance with the requirements of the Endangered Species Act, National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act stated herein. By "further ground disturbing work," the Court means any ground-disturbing work other than the removal of downed timber that is identified as having been cut down prior to the issuance of the *Temporary Restraining Order* [Doc. No. 13] at 6:30 P.M. on January 14, 2004. All mitigation measures and other conditions required under the USFS's Decision Notice and FONSI still apply to the removal of such downed timber.

**IT IS FURTHER ORDERED** that Plaintiffs are not required to post bond.

**SO ORDERED** this 4th day of February, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge